## AFFIDAVIT OF JOHN S. SOARES IN SUPPORT OF CRIMINAL COMPLAINT

I, Special Agent John S. Soares, being duly sworn, state:

### Introduction

1.      I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), in that I am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516.

2.      I am a Special Agent with the United States Department of Homeland Security ("DHS"), Homeland Security Investigations ("HSI"). I have served in this capacity since May 2009. My current responsibilities include conducting federal criminal investigations, including investigations of financial fraud schemes, money laundering, and violations of the Bank Secrecy Act, and participating in operations to protect the United States from exploitation of legitimate trade, travel, and financial systems. I have received specialized training in investigating financial crimes, money laundering, and asset forfeiture. During my employment with HSI, I have been involved in the investigation of financial crimes, fraud schemes, money laundering, and in identifying and seizing criminally derived proceeds and property.

3.      As an agent assigned to this matter, I have personally participated in many aspects of the investigation described below. I am also familiar with the facts and circumstances of the investigation through discussions with other HSI personnel and others, and from my review of business records, reports and other materials relating to the investigation.

4.      I submit this affidavit for the limited purpose of establishing probable cause to support a criminal complaint charging Carlos N. Wanzeler ("Wanzeler") and James M. Merrill ("Merrill") with, between in or about January 2012 and in or about April 2014, conspiring to

commit wire fraud, in violation of 18 U.S.C. § 1349, based on their operation of a substantial

pyramid scheme.

5.     The facts in this affidavit are drawn from my review of documents and data

obtained during the investigation, my training and experience, and information obtained from

other agents. This affidavit is only intended to show that there is sufficient probable cause for the

requested warrants.  It does not contain all facts relevant to this matter.

**Allegations Pertaining to Probable Cause**

I.     **Overview**

6.     TelexFree, Inc., and TelexFree LLC (collectively, "TelexFree") ostensibly

provide "voice-over-internet-protocol" ("VOIP") telephone services, for which customers can

sign up via a Web site maintained by TelexFree.  Based on our investigation, however,

TelexFree is actually a pyramid scheme.

7.     Based on my training and experience, a pyramid scheme typically involves a

seemingly legitimate business that purports to sell a product but actually derives the bulk of its

revenue not from selling the product to third parties but from recruiting new participants to pay

into the system.  The hallmark of these schemes is typically a promise of substantial returns in a

short period of time for doing little beyond paying into the organization and convincing others to

do the same.

8.     People operating pyramid schemes often go to great lengths to layer the program

with jargon, procedural complexities, a formalized hierarchy of participation, and other trappings

that create the appearance of a legitimate company pursuing a (legal) multi-level marketing

program.  But, as in "Ponzi"-type schemes, the organizers simply take in money from newly-

invested participants and use those funds to pay the returns promised to earlier participants.

9.      Again like Ponzi schemes, pyramid schemes are ultimately unsustainable because the returns promised to an ever-growing number of participants must be paid using funds deposited by a necessarily finite pool of new participants.  At some point the scheme must become too big, that is, it must run out of new participants depositing sufficient cash to cover commitments to earlier participants and, because the underlying product is not in fact profitable, most of the scheme's participants lose their money.

10.     In this case, between about January 2012 and March 2014, TelexFree purported to aggressively market its VOIP service by recruiting thousands of "promoters" to post ads for the product on the Internet.  Each promoter was required to "buy in" to TelexFree at a certain price, after which they were compensated by TelexFree, under a complex compensation structure, on a weekly basis so long as they posted ads for TelexFree's VOIP service on the Internet.  What TelexFree failed to disclose, however, was that the VOIP service was a front, and that the ad-posting requirements were a meaningless exercise, in which promoters cut and paste ads into various classified ad sites provided by TelexFree and already saturated with ads posted by other promoters.

11.     In fact, as TelexFree's bank records and "back office" business data attest, it derived only a fraction of its revenue from sales of VOIP service – about 1% of TelexFree's hundreds of millions of dollars in revenue over the last two years.  The overwhelming majority of its revenue came from new people buying into the scheme.  In fact, TelexFree was only able to pay the returns it had promised to its existing promoters by bringing in money from newly-recruited promoters.

12.     In 2013, the Massachusetts Securities Division ("MSD") began investigating TelexFree, including serving TelexFree with demands for various kinds of information about its

operations.  On or about March 9, 2014, TelexFree announced changes to its compensation system that appear to have been prompted at least in part by the MSD investigation.  (Under the prior system, discussed further below, TelexFree promoters could invest in the company and make money without selling any actual product.)  In video clips posted on YouTube, a TelexFree senior executive admitted to TelexFree promoters that the changes were necessary "to come into compliance."  Soon after the changes were announced, promoters began protesting at TelexFree's Marlborough, Massachusetts, headquarters because the new system required them to actually sell TelexFree's VOIP product and, as one promoter told a news reporter, "It's almost impossible to sell."

13.    On April 14, 2014, the TelexFree scheme collapsed:  Facing massive liabilities to its existing promoters, TelexFree and its related entities filed for voluntary Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the District of Nevada (No. 14-12524-ABL).  In a declaration filed in the bankruptcy proceeding on behalf of the company, the company said, among other things, that it changed its compensation plan in March 2014 "[b]ecause questions were raised" about the prior plan.  TelexFree also admitted that it was entering bankruptcy because, after changing the compensation plan, "These discretionary payments [that is, payouts to current investors] quickly became a substantial drain on the Company's liquidity."  In other words, once new investor dollars stopped coming in, TelexFree was unable to pay its current investors.

14.    The day of the bankruptcy filing, TelexFree's web site, which all TelexFree promoters use to manage their accounts and transfer funds paid to them by TelexFree, became inoperative.  The company posted a notice on the site telling its investors that the situation was temporary and that TelexFree looked forward to reorganizing and continuing to do business.

15.    The next day, April 15, 2014, federal agents executed three search warrants, including at TelexFree's headquarters in Marlborough, Massachusetts.  During that search, a law enforcement officer intercepted TelexFree's acting Chief Financial Officer ("CFO") trying to leave the premises with a laptop and a bag.  Initially, the acting CFO said he was a consultant for TelexFree and was retrieving personal items.  In the bag, however, law enforcement officers found ten Wells Fargo Bank cashiers' checks totaling $37,948,296.  Eight of the checks were dated April 11, 2014 (the Friday before the April 14, 2014, bankruptcy filing) and were remitted[1] to Merrill.  Of these, five checks were made out to TelexFree LLC, in the total amount of $25,548,809, while one check was made out to Wanzeler's wife, in the amount of $2,000,635.  One check, dated April 3, 2014, and remitted to Wanzeler himself, was made out to TelexFree Dominicana SRL,[2] in the amount of $10,398,000.

16.    Law enforcement officers seized the checks.  Agents later determined that Merrill and Wanzeler's wife had traveled to Rhode Island on or about April 11, 2014, to pick up the checks (except the check made out to TelexFree Dominicana SRL, which had been picked up by Wanzeler earlier in April) from a Wells Fargo branch in Rhode Island.

## II.    The Brazilian Investigation of TelexFree

17.    TelexFree operated in Brazil, initially under a different name, before basing itself in the United States.  Announcing that it had uncovered "evidence of crimes," the Brazilian government began investigating TelexFree in or about January 2013 and eventually shut it down.  Documents provided by Brazilian law enforcement authorities, among other sources, show that

---

[1] That is, Merrill was identified on the checks themselves as the remitter and purchaser of each check.

[2] TelexFree Dominicana SRL appears to be an entity separately established in the Dominican Republic with business operations similar to TelexFree in the United States.

TelexFree in Brazil operated with effectively the same structure, and even the same sales terminology, as TelexFree later used in the United States, and that the Brazilian consumer protection authorities soon concluded that TelexFree was a pyramid scheme.  The Brazilians also determined that Wanzeler, Merrill, and a third person, Carlos Costa, owned the  Brazilian entity.  It appears that Wanzeler registered the entity in Brazil in 2010, naming it "Ympactus," which began doing business as TelexFree in 2012.

18.     The Brazilian investigation resulted in a Brazilian civil enforcement action against TelexFree in June 2013, in which the Brazilian government won an injunction prohibiting TelexFree from recruiting new promoters and from taking in funds or paying money to existing TelexFree promoters.[3]  Despite numerous appeals by TelexFree, as of the date of this affidavit the injunction remains in effect.

19.     In March 2014, both Wanzeler and Merrill were subpoenaed to give sworn testimony before the MSD.  According to Wanzeler's testimony, the Brazilian government froze about $350,000,000 in funds belonging to TelexFree.  Records from the Brazilian Ministry of the Treasury show that, since TelexFree began recruiting promoters in Brazil, TelexFree bank accounts in Brazil had received about $446,000,000 in U.S. dollars. The records also noted that on or about February 19, 2013, TelexFree's Brazilian bank balances totaled over $200,000,000.  The Brazilian Ministry of Treasury materials also showed that transfers were made from

---

[3]  Based on public news sources, after the order was issued a representative of the Brazilian government said, "Owners of the company [TelexFree] are suspected of mounting a financial pyramid.  Telexfree in Brazil is recruiting investors and creating a pyramid scheme under the guise of multilevel marketing. There are multilevel marketing companies already established in the market as Herbalife, Mary Kay and Tupperware. They work with this system, in the case of Telexfree the interest is not to sell products but to recruit new people. The focus of Telexfree in Brazil is not the sale of products or services, but membership new people to feed the payment system."

TelexFree bank accounts to Brazilian bank accounts belonging to Wanzeler, and from there to U.S. accounts in Wanzeler's name.

20.     As discussed further below, a review of filings by U.S. banks for TelexFree's banking activity in 2012 – 2013 show a pattern similar to the activity uncovered in Brazil: significant sums deposited to TelexFree accounts, generally in small amounts, which were rapidly disbursed, again in small amounts.  Meanwhile, based on the government's investigation, little of the money appeared to be derived from selling a product to genuine retail customers.

### III.     TelexFree's Corporate Structure in the United States and its Connection to Merrill and Wanzeler

21.     According to incorporation paperwork on file with the Commonwealth of Massachusetts and other states, Wanzeler and Merrill own and operate a U.S. company called TelexFree, Inc., as well as certain related entities.

22.     Through a review of public records, the government learned that TelexFree was originally known as "Common Cents Communications." Common Cents Communications was incorporated in Massachusetts in December 2002 and listed Carlos Wanzeler as President and James Merrill as Treasurer.  Two other men were listed as directors of the corporation.

23.     In February 2012, Common Cents Communications filed an article of amendment with the Commonwealth of Massachusetts, changing the name of the corporation to "TelexFree, Inc."  The article of amendment was filed by Wanzeler in his capacity as President. In October 2012, TelexFree, Inc., filed an annual report with the Massachusetts Secretary of State, in which Wanzeler and Merrill were listed as the sole officers and directors of the company. The incorporation documents for TelexFree list a corporate address in Marlborough, Massachusetts.

24.     In July 2012, an entity named "TelexFree" was registered as a limited liability company ("LLC") in the State of Nevada. The company listed Wanzeler, Merrill, and Carlos

Costa as officers of the LLC.  In April 2013, TelexFree LLC filed an application for registration as a foreign limited liability company with the Massachusetts Secretary of State.

25.     Wanzeler and Merrill have both admitted, under oath, that they run TelexFree's operations in the United States.  During sworn testimony before the MSD in March 2014, both men confirmed their leadership positions at TelexFree and confirmed that each of them owns 50% of the company.

26.     Based on an analysis of financial records, both men also paid themselves millions of dollars from the investor funds accumulated in TelexFree accounts.  By the end of 2013, Merrill had transferred over $3,000,000 from TelexFree accounts to his personal accounts.  By that point Wanzeler – primarily through money transfers authorized by Merrill – had received over $7,000,000.

27.     It appears that TelexFree, Merrill, and Wanzeler are also intertwined with other entities, including Brazilian Help, Inc., Diskavontade, Ympactus (noted above), and TelexFree Financial.  During his testimony before the MSD, Wanzeler described Ympatcus as the Brazilian incarnation of TelexFree; both companies shared the web site www.telexfree.com, and Ympactus used the TelexFree brand name in Brazil.

28.     The relationships among TelexFree, LLC; TelexFree, Inc.; and TelexFree Financial are equally interwoven.  Wanzeler testified that TelexFree Financial was created to pay the employees of TelexFree LLC and TelexFree, Inc., because they "have so many problems with the bank."  As discussed further below, this appears to be a reference to U.S. banks repeatedly shuttering TelexFree accounts in 2012 and 2013 because of concerns that Merrill and Wanzeler (the signatories) were doing something illegal.

**IV.** **TelexFree's U.S.-Based Business Operations**

29.     TelexFree maintains a website, www.telexfree.com.  As further discussed below, TelexFree's VOIP product, usually called 99TelexFree, could be bought directly through the website access TelexFree provided to its promoters.  Certain factors, however, distinguish TelexFree and its product from the operations of a legitimate company.  For example:

    a.     The product appears poorly designed for acquiring and keeping retail VOIP customers.

    b.     The way TelexFree compensated those who signed up to "promote" the VOIP product had little or nothing to do with actually *selling* the VOIP product, and the compensation system was not based on a sustainable business model.

    c.     An analysis of the bank and credit card processing accounts behind TelexFree's publicly-stated income and revenue figures shows that TelexFree was deriving less than 1% of its revenue from its VOIP products, about 99% from investments by new promoters, and that it could not meet its massive payment obligations to existing promoters without equally large infusions of cash from new promoters.

    d.     TelexFree's public statements, including statements and instructions to its promoters, consistently omitted the fact that TelexFree's survival, and so promoters' profits, depended on a constant influx of new promoters, and not on selling the VOIP product.

**A.**     **The Product TelexFree Purported to Sell**

30.     The 99TelexFree product allows the user to make Internet-based long distance calls to foreign countries.  It is downloaded by the purchaser and installed on a computer (or,

more recently, on a smartphone), after which the purchaser registers his phone number with TelexFree. The purchaser can then call a local access number from the registered phone number. When the TelexFree system recognizes a call by a registered phone number, the purchaser is alerted by a new dial tone and can then complete an international call.

31.     The process for buying TelexFree's VOIP service is cumbersome.  On April 9, 2014, an HSI agent acting in an undercover capacity ("UC2"),[4] bought a TelexFree VOIP package from a promoter via the TelexFree website.  The initial steps in the process took over two hours, including unusual steps like setting up an electronic "eWallet" and uploading to TelexFree copies of UC2's drivers license and credit card.

32.     Beyond credit card sales, it appears that a customer could have bought the VOIP service by paying the $49.90 monthly fee directly to a promoter, after which TelexFree subtracted that amount from what TelexFree owed the promoter in "buy back" fees or commissions (discussed below).  There is no indication, however, that significant retail sales of 99TelexFree to genuine third party customers were accomplished in this manner.  For example, the site itself allowed for the use of a credit card for payment, an especially likely option in scenarios, like this one, where ongoing monthly payments were needed if someone actually used the service.  Individual persons who are promoters are unlikely to take credit cards.

**B.     The Compensation Structure – Making Money Without Selling Anything**

33.     The TelexFree site, www.telexfree.com, explains how TelexFree compensates participants.  TelexFree instructional videos, available on YouTube, also describe the numerous ways TelexFree pays its promoters.  From approximately March 2012 to September 2012, the

---

[4]  The activities of the initial undercover agent working on this investigation are discussed below.

TelexFree site contained a "promoters" link that told potential promoters that they could, "Earn money doing announcements on Internet!"   That is, the site told potential investors that, after an initial investment in the company, they could make money for a year without selling any of TelexFree's VOIP services, simply by posting ads for the product.  For example, in the summer of 2012 the website said, in part, the following:

> Be our promoter
> Earn money doing announcements on Internet!
> Through a ADCENTRAL, that you geot [sic] for the amount of US$299
> (annually).
>
> The promoter will receive US$20 each week that makes 7 different
> announcements in websites of free announcements online, from Monday to
> Sunday.  All in a way fast, easy, and standardized in your virtual office (BO)
> Telexfree.
>
> This will be for the 52 weeks of the year, of your contract, then see the
> simulation:
>
> 52 weeks x $20 (Putting the 7 announcements) = $ 1,040 in the year

34.     The TelexFree site also had a link – next to a photograph of James Merrill – that read, "See our opportunity presented by our President James Merrill."  The link was connected to a downloadable PowerPoint presentation, described as "the opportunity of your lifetime."  The presentation encouraged people to sign up as promoters and "Earn money the smart way! Without having to invite anyone, without selling anything in the comfort of your own home."  It went on to explain that by placing one advertisement for TelexFree a day a promoter could earn $20 per week, $80 per month, $1,040 per year, with $741 in net profit per year.  The presentation encouraged potential promoters to join under an "AdCentral Family Plan" (explained further below).

35.     An analysis of the TelexFree site, made while the original compensation system was operating (about January 2012 to March 9, 2014), showed that when a promoter joined

TelexFree he was required to have a user name to access the "back office" area of the site. This was the area from which TelexFree promoters managed their sales activities. Once a promoter accessed the "back office," he was able to copy advertisements already prepared by TelexFree, after which the promoter pasted those pre-made ads into various other websites that allowed free "classified" advertising. TelexFree provided the links to those sites; the promoter could post the ads to whichever of these sites he chose. After posting an ad, the promoter submitted a link to the advertisement's internet protocol ("IP") address to TelexFree, which then verified that the ad was placed.

36.     Agents, on multiple dates, reviewed the approximately ten sites to which TelexFree directed its promoters to post advertisements. These sites, each of which allowed people to post small ads for free, bore hundreds of identical ads for TelexFree. A "screen shot" of a typical site, retrieved by HSI personnel, appears below:



37.     Beyond the seeming futility of posting ads like those above, promoters were prohibited from posting TelexFree ads anywhere else.  Moreover, according to Merrill's sworn testimony before the MSD, no promoter ever even asked the company for permission to do so.

### C.     The Compensation Structure – Individual Earnings

38.     Overall, between in or about January 2012 and early March 2014, TelexFree's compensation structure was convoluted.  As discussed below, there were two buy-in levels available and, after buying into the company, a new participant could be compensated as an individual, or as part of a "team," earning additional money by recruiting new promoters.  As to the buy-in levels, the greater the investment by the promoter, the higher the return.  Moreover, nothing prevented a single promoter from buying in multiple times.

39.     The information below is based on a review of the TelexFree site; YouTube postings by TelexFree personnel and various promoters; and conversations between an HSI undercover agent and a successful TelexFree promoter (discussed further below).

### 1.     *The $289 Buy-In Level (AdCentral)*

40.     All new promoters were required to first pay a $50 membership fee.  After paying the fee, TelexFree would set up a new "back office" site for that user.  After paying this fee, the user then had the option of buying two different "AdCentral" packages, priced at $289 and $1,375.

41.     At the $289 buy-in level,[5] the promoter was compensated *regardless* of whether there were any retail sales of the VOIP product.  The company called this plan "AdCentral." As with the $50 buy-in, TelexFree provided ads and free websites on which to post the ads.[6]

---

[5]   The cost of this buy-in level may have changed slightly over time.

42.     In the AdCentral plan, the company gave the promoter access to a "stock" of ten VOIP products to sell that week, and then each week thereafter for 52 weeks.  If an AdCentral promoter posted ads for seven consecutive days, the company agreed to "buy back" any unsold stock from the promoter for $20, and to continue to do so every week for a year.  This buyback happened even though the promoter paid no money to TelexFree for the stock in the first place.

43.     In short, an investment of $350 (the AdCentral promoter's initial buy-in amount), resulted in an annual return of $1,040 ($20 x 52), without requiring the sale of a VOIP product, so long as the promoter posted advertisements on a site identified by TelexFree.

### 2.     *The $1,375 Buy-In Level (AdCentral Family)*

44.     The higher buy-in level, which required an investment of $1,375 (plus the initial $50 fee described above),[7] was called AdCentral Family.  This level operated the same way as the AdCentral buy-in discussed above, but TelexFree gave the promoter a "stock" of 50 VOIP products (instead of 10), and instead of placing one ad per day the promoter had to place five ads per day.  At the end of the seven day period, the company would then "buy back" the unsold stock from the AdCentral Family promoter for $100, and continue to do so for the remaining 51 weeks.

45.     If someone paid TelexFree to become an AdCentral Family promoter, and met the ad-posting requirements, TelexFree would pay that person an annual return of $5,200, regardless of whether a VOIP product was soled

---

[6]  In the event of a retail sale based on one of those ads, the promoter received a 90% commission, that is, $44.99 out of the $49.99 the retail customer paid for the first month of TelexFree's VOIP service.  As in the $50 buy-in, if that retail customer renewed on a monthly basis, that AdCentral promoter earned an additional 10% commission each time.

[7]  As above, this amount appears to have changed slightly over time.

D.     **The Compensation Structure – "Team" Earnings**

46.     People were incentivized to recruit other people, who would then recruit additional people, and so on, while no one level of participants needed to make genuine retail sales of the VOIP product to make money from TelexFree.  To qualify for the various team-based income streams TelexFree made available, TelexFree required a promoter to make at least one retail sale of the 99TelexFree VOIP product.

1.     *Compensation for Direct Recruitment*

47.     The first method of team earnings came from the direct recruitment of new promoters.  For each direct recruit who bought in at the AdCentral level ($350), the recruiting promoter got a $20 "fast start" bonus. For each direct recruit who bought in at the AdCentral family level ($1,425 total), the bonus was $100.  To maximize compensation, promoters had to ensure that their direct recruits then developed their own recruits, which would result in additional compensation.  Higher promoters could also profit from TelexFree "buying back" stock from promoters they had recruited.  The original promoter would be paid for "buy backs" going six levels deep.  Promoters would also profit from actual VOIP sales made by lower level promoters.

2.     *"Team Builder" Bonuses*

48.     TelexFree also provided "team builder bonus" compensation. To qualify for this compensation, a promoter must have made five retail sales of the 99TelexFree VOIP product, must have directly recruited 10 AdCentral Family promoters, and each of those recruits must have themselves also made five retail sales of 99TelexFree. The maximum bonus available as a team builder was $39,600.

E.      **Corroborating Information from Undercover Activities**

49.      During the investigation, a law enforcement officer arranged to have him/herself recruited as a TelexFree promoter, to confirm how portions of the TelexFree system operated. On October 15, 2013, an undercover HSI task force officer ("UC") met with a TelexFree promoter ("Person A").  During the conversation, Person A told the UC that the UC could make $100 a week using an "AdCentral Family Package" to post online ads for TelexFree, and could earn additional money by recruiting other people to join TelexFree.

50.      The UC met Person A again the next day, and successfully joined TelexFree as a new promoter.  The UC bought the AdCentral Plan for $1,425 (a $50 membership fee plus $1,375 for the AdCentral package), using a check made payable to Person A.  Person B, an associate of Person A, helped the UC register and verify the UC's new TelexFree "back office" account.  This consisted of entering a name, date of birth, Social Security number, cellular telephone number, email address, and mailing/billing address.  In order to access the back office, the UC created a unique log-in name and password.

51.      Starting on October 21, 2013, using the UC's access to the TelexFree system, an HSI Intelligence Research Specialist placed online advertisements as a promoter for TelexFree. Following the system discussed above, the Specialist copied advertisements created by TelexFree and made available to the Specialist in the back office area of TelexFree's site, and pasted them to another website TelexFree recommended.  As required under the AdCentral Family plan, the Specialist did this five times a day.  The entire process took about 25 minutes per day.

52.      Between October 21, 2013, and the date of this affidavit, the Specialist posted more than 700 advertisements.  The ads have resulted in no retail sales of TelexFree's VOIP

product.  As described above, the sites on which these ads were posted contained page after page after page of hundreds of nearly identical ads placed by various TelexFree promoters for the identical VOIP service.

53.     During a conversation with Person A on November 2, 2013, Person A told the UC that the UC did not need to sell TelexFree's VOIP product in order to make money, but could just post ads.  Similarly, in a meeting on December 2, 2013, Person A told the UC that, since July 2012, he had earned $1,600,000 as a TelexFree promoter, without selling a TelexFree product.

54.     On December 6, 2013, the Specialist set up an "electronic wallet" (or "eWallet") through the TelexFree back office.  On January 14, 2014, an undercover bank account was linked to the eWallet and, after that date, the account received payments from TelexFree for the posting of advertisements.

### F.     TelexFree's Revenue Derived Almost Entirely from Money Invested by New Promoters

55.     Among the documents the government has reviewed are profit and loss statements and balance sheets for both TelexFree, Inc., and TelexFree LLC, which TelexFree provided to the MSD.  The government has also reviewed financial information TelexFree submitted to various state regulatory agencies, including Idaho, Washington, and Tennessee.  There are various inconsistencies among these submissions.

56.     For example, in April 2013, a lawyer for TelexFree, Inc., and TelexFree LLC submitted to MSD a 2012 profit and loss statement for TelexFree, Inc., followed by another version in February 2014.  The figures on the two statements substantially differ.  The statement submitted in April 2013 listed about $1,800,000 in total income for TelexFree, Inc., in 2012,

while the February 2014 statement listed $2,800,000.  As another example, the first profit and

loss statement listed "agent commissions" as $520,582.95, while the second said $2,105,925.61.

57.     Moreover, the 2013 profit and loss statements and balance sheets for TelexFree

Inc. and TelexFree LLC, as submitted to MSD in February 2014, reported massive income and

other figures for TelexFree:

| Description | TelexFree LLC | TelexFree Inc. | Combined |
|---|---|---|---|
| Income<br>– Paid through Bank | $119,468,920.12 | $56,195,790.54 | $175,664,710.66 |
| Income<br>– Paid through System | $572,240,960.21 | $268,930,757.53 | $841,171,717.74 |
| Total Income | $691,709,880.33 | $325,126,548.07 | $1,016,836,428.40 |
| Total Cost of Goods Sold | $2,263,476.65 | $397,736.51 | $2,661,213.16 |
| Agent Commissions<br>– Paid through Bank | $50,670,290.64 | $20,666,027.60 | $71,336,318.24 |
| Agent Commissions<br>– Paid through System | $571,917,743.23 | $268,930,757.53 | $840,848,500.76 |
| Total Agent Commissions | $622,588,033.87 | $289,596,785.13 | $912,184,819.00 |

58.     The "System" referred to in the chart above was TelexFree's computerized "back

office" system.  Within that system, promoters could accumulate credits owed to them by

TelexFree and perform other transactions.  Merrill, Wanzeler, and others working at TelexFree

had access to the system.[8]

### 1.     *Incoming Funds to TelexFree Bank Accounts*

59.     TelexFree took in funds from two sources:  fees people paid to become TelexFree

promoters and sales of the company's 99TelexFree VOIP service, which has been sold for

$49.90 per month since at least 2012.  As noted above, in the financial statements TelexFree

---

[8] The Profit and Loss statement for TelexFree LLC reflects additional income of $174,183,644.66
from Ympactus, TelexFree's operation in Brazil, which is not reflected here.

submitted to the MSD and other regulatory authorities, it reported income as either "paid through banks" or "paid through system."

60.     In the government's investigation thus far, agents reviewed bank account, credit card merchant, and other third-party records in an effort to determine the volume of sales of the VOIP product.  The investigation to date has identified and obtained records of approximately 14 bank accounts opened and operated in the United States in the name of TelexFree Inc. or TelexFree LLC since February 2012 (not all operating at the same time).  For each of these accounts, the signatories were Wanzeler and Merrill or, for many of the significant TelexFree accounts, just Merrill.

61.     TelexFree used so many accounts in a roughly two year period because U.S. banks, following their protocols for deterring money laundering or other financial misconduct, repeatedly shut them down and forced Merrill and Wanzeler to transfer the funds elsewhere. After initially operating out of Bank of America in or about February 2012, Merrill and Wanzeler later opened accounts at TD Bank, Citizens Bank, Fidelity Co-op Bank, and Middlesex Savings Bank – each of which ultimately terminated their banking relationships with Telexfree.

62.     During the government's review of the TelexFree bank accounts agents have identified, a general pattern emerged.  The vast majority of the thousands of deposits to these accounts appear to be buy-in fees for TelexFree promoters.  But of the thousands of cash, check, wire transfer, or money order deposits into the TelexFree accounts – totaling tens of millions of dollars in 2013 – only 19 appear to be for the purchase of TelexFree's VOIP service.  For example:

> a.     A review of Bank of America account XXXXXXXX7408 opened in the name of TelexFree, Inc., in February 2012 revealed that between June 2012 and

May 2013, the accounts received 1,133 deposits, totaling $12,203,496.48.
Between September 2012 and May 2013 there were 813 deposits in the exact
amount of an AdCentral Family buy-in ($1,425 or $1,375) totaling $1,142,625.
During that same period there were nine deposits in the amount of $49.90 – the
VOIP purchase price.

b.      Similarly, in September 2012 accounts were opened at TD Bank in the
name of TelexFree Inc. and TelexFree LLC.  In account #XXXXXX8409, in the
name of TelexFree LLC, between October 9, 2013, and January 17, 2014, there
were 478 incoming wires ranging from $309 to $142,500, totaling $2,638,712.
Of the deposits, there were 2,474 in the amount of $1,425, totaling $3,525,450.
Deposits were made in multiple states along the eastern coast of the United States.
During that same period there was one deposit for $49.90.

c.      As to account #XXXXXX2808 at TD Bank, in the name of TelexFree
LLC, between September 2012 and July 2013, there were 1,550 deposits by cash,
check, money order or wire transfer in the exact amount of $1,425 (again, the
AdCentral buy in price).  During that same period there was one deposit for
$49.90 (VOIP purchase price).

d.      As to account #XXXXXXX334 at TD Bank, in the name of TelexFree
LLC, between June and October 2013 there were 1800 deposits in the amount of
$1,425. There was one deposit of $49.90.

### 2.      *Incoming Funds Paid Through Credit Card Processing Services*

63.     TelexFree also employs credit card processors to process payments to TelexFree's
website, creating another potential avenue for customers to pay for VOIP service (as mentioned

above, the site allows customers to use a credit card to pay for 99TelexFree).  As with the banks

used by Telexfree, the entities processing TelexFree promoter and customer payments, including

PayPal, ProPay, Inc., and Global Payroll Gateway, Inc.,[9] terminated their relationships with

Telexfree.  On behalf of TelexFree, when dealing with these processing services Merrill and

Wanzeler also minimized, or simply failed to note, that TelexFree was the subject of

enforcement activity in Brazil.

     64.    A review of the EFT deposits and payouts from the TelexFree accounts indicates

credit card processors have made large deposits to TelexFree accounts, as has PayPal.  Based on

an analysis of the accounts, ProPay Inc., a credit card processor, processed credit card

transactions for TelexFree from September 2012 to June 2013.  Global Payroll Gateway, Inc.,

another such processor, processed credit card transactions for TelexFree from June 2013 to

September 2013, and I-Payout has recorded and tracked credit card payments processed through

three other credit card processers since October 2013.

     65.    A review of the credit card processor records further confirms that while

TelexFree in fact sold some 99TelexFree VOIP packages, the overwhelming percentage of

incoming revenue was from new people investing in TelexFree to become promoters.  For

example,

        a.    Agents reviewed business records from ProPay, Inc.  In 2013, ProPay

        processed 32,471 credit card sales (net of refunds and chargebacks) for TelexFree,

        totaling $29,150,021.19.  ProPay also processed 6,098 credit card sale

        transactions (net of refunds and chargebacks) in the amount of $49.90 – the price

        of TelexFree's VOIP product.  These sales totaled only $304,283.74.

---

[9] Global Payroll Gateway partnered with a processing service called Phoenix Payments.

b.      Agents also reviewed business records received from Global Payroll Gateway ("GPG").  Between June 2013 and September 2013, GPG/Phoenix Payments processed total sales of $37,419,522.69 for TelexFree.  Based on the records and additional information provided by GPG, GPG processed 49,656 credit card transactions for TelexFree between June 12, 2013, and September 4, 2013.  Of those transactions, 7,362 (approximately 15%) were for less than $50 and, assuming every one of these transactions were to buy the VOIP product (which is unlikely), the sales revenue attributable to VOIP sales in this period was $367,363.80, or about 1% of total sales processed by GPG, a ratio similar to ProPay above.[10]

c.      Agents also reviewed records provided by i-Payout, a payment processing company that disbursed funds for TelexFree and provided record-keeping services for certain credit card payments made by promoters for buy-ins, and by purchasers of the VOIP product.  The records show that in 2013 i-Payout recorded 52,562 payments to TelexFree totaling $66,036,927.99.  Of these, there were 2,153 invoices for $49.90 (the monthly VOIP cost), totaling $107,434.70, or less than .2%.

66.     I note that in its written response to questions from the MSD, with a signed verification by Wanzeler, TelexFree reported that in 2012 and 2013 it sold 4,845,576 VOIP packages to people outside TelexFree's distribution network (meaning, not promoters, but actual arms-length customers) and that these sales amounted to $238,395,353.  The government has not uncovered documentation supporting this figure.  In total, in our review of TelexFree's bank

---

[10] There were also 31,129 credit card transactions in excess of $1,000.

account and credit card merchant account activity for the period January through December 2013, we identified approximately 15,630 payments to TelexFree, totaling only $779,930.54, for monthly purchases of the 99TelexFree VOIP product.  Based on TelexFree's reported sales of $1.016 billion, known sales of the 99TelexFree VOIP product represented a tiny fraction of TelexFree's total revenues.

### 3.   *Outgoing Funds from TelexFree Accounts*

67.     Just as sales of the VOIP product represented a fraction of TelexFree's revenue, the rest coming from new investors, the overwhelming majority of disbursements by TelexFree were to pay monies owed to existing promoters.

68.     First, a review of funds disbursed from TelexFree's bank accounts showed that some funds have been paid to vendors that appear to support the necessary infrastructure for the 99TelexFree VOIP system.  For example, payments, totaling about $4,000,000, were identified going to iBasis, IDT Telecom, Liga Telecom, Exigo Office, Access Northeast (Xand), and Amazon Web Services.  We also isolated other payments to law firms and consulting firms specializing in the "multi-level marketing" industry.

69.     In the financial statements furnished by TelexFree to the MSD, the company reported for 2013 Cost of Goods Sold for TelexFree, Inc., and TelexFree LLC as $2,263,476.65 and $397,736.51, respectively, totaling $2,661,213.16.  These costs of goods sold are described in the financial statements as Direct Inbound Dial & Access Numbers, Telecomm & Database Network Expense, and Termination.

70.     In this same period, in which the government has identified only $779,930.54 from sales of the 99TelexFree VOIP product, TelexFree's submission to the MSD reflects commissions paid to agents, either directly or indirectly ("through the system"), of over

$912,000,000, indicating that outgoing commissions were funded primarily with money invested by new promoters.

71.     As a representative example, Citizens Bank account XXXXXX8206 was opened in Massachusetts on February 5, 2013, in the name of Telexfree LLC, with Merrill and Wanzeler as the authorized signers.  A review of wire transfer data from that account showed that between February 21, 2013, and August 6, 2013, 7,340 wire transfers were made.  Of those, 38 wire transfers, totaling $808,301.34, were made to entities such as iBasis, telecom companies, and electronic storage providers.  The remaining 7,302 wire transfers – totaling $11,272,627.04 – were made to individual persons, in amounts ranging from $270.00 to $116,650.  Moreover, 1,023 of the wires to individuals were in the exact amount of $272.00, which, as explained in the "back office" portion of Telexfree's site, appears to be the minimum transfer amount TelexFree will send to promoters ($300, less transfer fees).

### 4.     *TelexFree's Financial Activities Involved the Substantial Use of Interstate Wires*

72.     As discussed above, TelexFree received thousands of deposits directly to its bank accounts and also through credit card processors who, after receiving payments from card users, transferred those payments in batches to TelexFree accounts.  These automated clearing house ("ACH") credit transactions were transmitted via wire communications in interstate commerce.

73.     As an example, on July 5, 2013, GPG recorded 176 sales transactions for TelexFree totaling $214,700.80.  On July 8, 2013, the proceeds from these sales transactions were credited to Telexfree's Citizens Bank account, no. XXXXXX9078, through an ACH credit transaction originating at Phoenix Payments in Tempe, Arizona, and terminating in the bank account of Telexfree at Citizens Bank in Massachusetts.  Other similar batch wirings included the following:

| Date | No. Sales | Total Sales | Deposit Date | Deposit Amount |
|------|-----------|-------------|--------------|----------------|
| 06/28/13 | 332 | $292,330.40 | 06/24/13 | $292,330.40 |
| 07/24/13 | 711 | $604,251.00 | 07/25/13 | $604,251.00 |
| 07/30/13 | 606 | $553,390.70 | 07/31/13 | $553,390.70 |
| 08/01/13 | 722 | $715,301.00 | 08/02/13 | $715,301.00 |

74.     In July 2013, GPG processed 13,649 sales transactions, in 33 batches over 22 days, which netted a total of $11,707,498.30, an amount that was credited, in 33 ACH transactions,  to Telexfree's Citizens Bank account.

75.     In 2012 and 2013, there were thousands of payments, by bank-to-bank or wire transfer out of TelexFree's accounts in Massachusetts to the accounts of TelexFree promoters elsewhere.  Based on my training and experience, I know that Citizens Bank's servers for processing banking transactions are in Rhode Island.

## V.     TelexFree's Misleading Public Statements about the Company's Operations

76.     TelexFree periodically hosted conferences (as did successful promoters) to generate excitement for TelexFree.  On March 9, 2014, members of HSI, some in an undercover capacity, attended the TelexFree "New Compensation Plan" Conference at the Marriott Copley Place Hotel, 110 Huntington Avenue, Boston, Massachusetts.  During this and other conferences, Merrill, Wanzeler and the other speakers gave the impression that TelexFree's VOIP product was groundbreaking, selling well, and that those sales were the primary mission of the company.

77.     During these events, and during similar YouTube appearances and conference calls, senior TelexFree personnel assured promoters that it would not affect TelexFree in the United States.  They did not note that TelexFree's U.S. operations were extremely similar to TelexFree's activities in Brazil.

78.     Merrill and Wanzeler spoke at the Boston conference, along with other TelexFree personnel and successful promoters.  Several people, including a TelexFree marketing executive and the head of "IT," touted the quality of TelexFree's VOIP product, its planned expansion, and

the opportunity to "market" it.  During Merrill's remarks, he said, among other things, "We can help people communicate with their friends and family overseas, for less"; "You are going to create communities of app users, each agent in here"; "You're gonna get paid"; "We are here to help you make money."

79.     Similarly, Wanzeler said, among other things, "TelexFree was built to change people's lives, save money for people [to] call [from] anywhere in the world to anywhere in the world"; "For over 20 years, I work in telecommunication. I was agent like you guys for big company in California. I learned the industry. I learned the product.  We put our own infrastructure, okay? We changed what we done in the past 20 years and built something nobody else have.  I can sit here today, please, if I'm lying here you can tell me, what company can give the opportunity for the people to call cell phone, landline, over 40 countries."

80.     Wanzeler continued, "We have a product and service no one else have; none of them.  What company here in the U.S. can give you guys the opportunity have mobile, call from mobile phone to over 40 countries unlimited? ATT do that?  Sprint?  T-Mobile? Anyone do that? 40 countries?  Cell and landline?  Anybody?  Yes?  No?  TelexFree only."  Wanzeler also said, in the preceding month, "Over 600,000 customers paid $49.90 to TelexFree99."

81.     Similarly, during the conference TelexFree's chief executive officer told the crowd, "We are here to build a long term sustainable business"; "We need your commitment to protect this opportunity for you and your families"; and "A long term sustainable business that can help your friends and family for years and years to come."  Another TelexFree employee told the audience, "We just heard an incredible number: 580,000 retail customers [for TelexFree's VOIP product] in February."

82.     Neither Merrill, Wanzeler, nor any other TelexFree executive mentioned that the company actually generated a only a fraction of its revenue from selling TelexFree's VOIP product, and instead depended on generating revenue from new promoters that could be used to cover TelexFree's payment obligations to existing promoters.  According to TelexFree's finances, the company was not profiting from TelexFree's promoters selling more VOIP products, but instead from the continuous flow of new promoters.

83.     Moreover, based on extensive review of TelexFree's banking activity, credit card activity, and portions of its back office data, Wanzeler's statement to the crowd that TelexFree had brought in "over 600,000 customers paying $49.90" in or about February 2014 was false.  In their testimony to the MSD, both Wanzeler and Merrill re-affirmed that 580,000 people bought VOIP packages in February 2014, and Wanzeler "guaranteed" that most of those people were "outside" retail customers.  But 580,000 customers each paying $49.90 would have generated $28,942,000 in revenue from VOIP sales, and thousands of $49.90 entries in TelexFree's bank and credit card processing records.  That revenue does not appear in TelexFree's bank and credit card processing records in that time frame.  As to "back office" activity, that would involve promoters, or people recruited by promoters, buying the product, and such persons would not appear to be legitimate "outside" customers.

## Conclusion

84.     I submit that the facts in this affidavit establish probable cause to believe that between in or about January 2012 and March 2014, Carlos Wanzeler and James Merrill knowingly conspired with each other and others known and unknown to commit wire fraud, that is, having devised, and intending to devise, a scheme and artifice to defraud, and to obtain money and property by means of material false and fraudulent pretenses, representations and promises,

caused writings, signs, signals, pictures and sounds to be transmitted by means of wire communication, in interstate commerce, for the purpose of executing that scheme and artifice, in violation of 18 U.S.C. § 1343, all in violation of 18 U.S.C. § 1349.

85.     Having signed this affidavit under oath as to all assertions and allegations contained herein, its contents are true and correct to the best of my knowledge, information and belief.

JOHN S. SOARES
Special Agent
Homeland Security Investigations

Sworn and subscribed to before me this  9th  day of May 2014, at Worcester, Massachusetts.

HON. DAVID H. HENNESSY
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS